Filed 8/21/15 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ED RUTLEDGE et al., | H036790 |
| Plaintiffs and Appellants, | (Santa Clara County Super. Ct. No. CV817837 |
| v. | **ORDER MODIFYING OPINION AND DENYING REHEARING** |
| HEWLETT-PACKARD COMPANY, | |
| Defendant and Respondent; | **NO CHANGE IN JUDGMENT** |
| BIZCOM ELECTRONICS, INC., | |
| Objector and Respondent. | |

THE COURT:

It is ordered that the opinion filed herein on July 22, 2015, be modified as follows:

1. On the signature line 2, the name "PREMO, J." is replaced with "ELIA, J." and on the signature line 3, the name "ELIA, J." is replaced with "WALSH, J.[*]" so the signature page reflects the correct panel as follows:

_____

RUSHING, P.J.

WE CONCUR:

_____

ELIA, J.

_____

WALSH, J.[*]

---

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

There is no change in judgment.

Respondent's petition for rehearing is denied.

2

_____

RUSHING, P.J.

WE CONCUR:


_____

ELIA, J.


_____

WALSH, J.[*]

---

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 7/22/15 (unmodified version)
**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| ED RUTLEDGE et al., | H036790 |
| Plaintiffs and Appellants, | (Santa Clara County Super. Ct. No. CV817837 |
| v. | |
| HEWLETT-PACKARD COMPANY, | |
| Defendant and Respondent; | |
| BIZCOM ELECTRONICS, INC., | |
| Objector and Respondent. | |


This case is a class action brought by purchasers of notebook computers that were manufactured by Hewlett-Packard, Inc. (HP). Appellants are I Braun Degenshein (Degenshein), and Susanna Giuliano-Ghahramani (Giuliano-Ghahramani), both of whom are representative plaintiffs of a class of California residents who purchased certain HP notebook computers.

The basis of appellants' consumer action against HP is that certain notebook computers manufactured by HP contained inverters that HP knew would likely fail and cause display screens to dim and darken at some point before the end of the notebook's useful life.

Appellants alleged claims against HP for violation of the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.), violation of the Consumer Legal Remedies

Act (CLRA) (Civ. Code, § 1750 et seq.), unjust enrichment and breach of express warranty.

After years of litigation, the trial court ultimately made a "no merits" determination as to the CLRA claim, and granted HP's motion for summary judgment as to appellants' remaining claims.

On appeal, appellants challenge seven trial court orders: two summary adjudication orders related to two different class representatives and the class itself, two class certification orders related to denial of a nationwide class and the denial of certification of the CLRA claim, and three discovery sanctions orders.[1]

### Summary Adjudication

" 'The purpose of the law of summary judgment [or summary adjudication] is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute.' [Citation.] As such, the summary judgment statute (Code Civ. Proc., § 437c), 'provides a particularly suitable means to test the sufficiency of the plaintiff's prima facie case and/or of the defendant's [defense].' [Citation.]" (*Law Offices of Dixon R. Howell v. Valley* (2005) 129 Cal.App.4th 1076, 1091 (*Valley*).)

The moving party "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850, fn. omitted (*Aguilar*).)

A cause of action has no merit under Code of Civil Procedure section 437c, subdivision (o), "if either of the following exists: [¶] (1) One or more of the elements of the cause of action cannot be separately established, even if that element is separately pleaded[, or] [¶] (2) [a] defendant establishes an affirmative defense to that cause of

---

[1] Please see the statement of facts from our previous opinion in *Hewlett Packard Co. v. Superior Court* (2008) 167 Cal.App.4th 87.

action." (*Aguilar, supra*, 25 Cal.4th at p. 853.)  The party moving for summary judgment "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact."  (Code Civ. Proc., § 437c; *Aguilar, supra*, 25 Cal.4th at p. 850.)

Thus, as here, when a defendant moves for summary judgment, he must make a prima facie showing, i.e., "he must present evidence that would *require* a reasonable trier of fact not to find any underlying material fact more likely than not—otherwise, he would not be entitled to judgment *as a matter of law*, but would have to present his evidence to a trier of fact."  (*Aguilar, supra*, 25 Cal.4th at p. 851, fn. omitted.)

"The moving party must satisfy his or her initial burden before the opposing party must controvert anything.  (§ 437c, subd. (p)(1) & (2).)  Accordingly, a moving defendant who claims that the plaintiff cannot prove all the elements of his case must present evidence in support of this claim. The defendant cannot simply challenge the plaintiff to prove his case by opposition.  (*Aguilar, supra*, 25 Cal.4th at pp. 854-855.)" (*Y.K.A. Industries, Inc. v. Redevelopment Agency of San Jose* (2009) 174 Cal.App.4th 339, 353 (*Y.K.A.*).)  In other words, "a plaintiff resisting a motion for summary judgment bears no burden to establish any element of his or her case unless and until the defendant presents evidence either affirmatively *negating* that element (proving its absence in fact), or affirmatively showing that the plaintiff does not possess and cannot acquire evidence to prove its existence."  (*Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 107.)

The court's "primary function [in evaluating a summary judgment motion] is to identify issues rather than to determine [them].  [Citation.]  . . .  If the evidence is in conflict, the factual issues must be resolved by trial."  (*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 839.)  Thus, should the court determine that triable issues of

3

fact exists, the summary judgment motion must be denied. (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1448.) "There is to be no weighing of the evidence." (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 880.)

Our review of the granting or denial of summary judgment is de novo. (*Valley, supra*, 129 Cal.App.4th at p. 1092.) In conducting such de novo review, we "consider[] all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) "This review consists of 'an independent assessment of the correctness of the trial court's ruling, [in which we] apply[] the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' [Citation.] We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale. [Citation.]" (*Valley*, *supra*, 129 Cal.App.4th at p. 1092.)

### *Factual Background*

Here, appellants challenge two orders of the trial court granting summary adjudication in favor of HP. The first is of Degenshein's claims in the first amended complaint.[2] The second is of Giuliano-Ghahramani's and the class claims in the second amended complaint.

The first amended complaint was filed on October 14, 2003, and alleged four causes of action against HP: Violation of the CLRA, violation of the UCL, unjust

---

[2] At the outset it should be noted that appellants do not provide the operative first amended complaint that was the basis of the first motion for summary judgment. This defect would have resulted in the judgment being affirmed in favor of HP based on an insufficient record. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295-1296 [failure to provide an adequate record on an issue requires that the issue be resolved against the appellant].) However, HP cured this defect by providing the first amended complaint in its appendix. Therefore, we consider the merits of appellants' claims.

4

enrichment[3] and breach of express warranty. The first amended complaint included Degenshein as the representative plaintiff. Degenshein purchased a Zinfandel 4.0 notebook computer in April 2002 that came with a standard one-year warranty from HP. Degenshein experienced problems with his display screen blacking out shortly before the expiration of his one-year warranty, but did not notify HP of the problem with his notebook until two months after the warranty had expired.

The second amended complaint was filed on February 24, 2010, asserting the same causes of action as the first amended complaint. The second amended complaint adds Giuliano-Ghahramani as representative plaintiff. Giuliano-Ghahramani purchased a Zinfandel 3.5 notebook computer in January 20502, and experienced problems with the display screen in November 2002. Giuliano-Ghahramani submitted the notebook to HP during the warranty and HP replaced the inverter.

In June 2009, the trial court granted HP's motion for summary adjudication and made a no merits determination as to Degenshein's claims. HP moved for entry of judgment against Degenshein. The court denied the motion, and instead, allowed Degenshein to amend the complaint to add Giuliano-Ghahramani as plaintiff. On October 7, 2009, the court approved Giuliano-Ghahramani as class representative. Giuliano-Ghahramani filed the second amended complaint in February 2010.

In June 2010, HP filed a motion for summary judgment as to Giuliano-Ghahramani and the class. The trial court granted the motion, and on April 11, 2011, the trial court entered judgment against Degenshein, Giuliano-Ghahramani, and the class as certified by the court.

---

[3] Appellants made no argument in the trial court and no argument on appeal regarding their unjust enrichment claim. We deem this issue waived. (*Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445, 1448 [the absence of argument allows this court to treat the point as waived].)

*CLRA[4] and UCL Claims*

"The CLRA proscribes particular 'unfair methods of competition and unfair or deceptive acts or practices' in transactions for the sale or lease of goods or services to consumers.  (Civ.Code, § 1770, subd. (a))"  (*Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 255 (*Collins*).)

The CLRA " 'enacted in 1970, "established a nonexclusive statutory remedy for 'unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer. . . .' [Citation.]" ' [Citation.]  'The self-declared purposes of the act are "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."  (Civ. Code, § 1760.)' "  (*Wang v. Massey Chevrolet* (2002) 97 Cal.App.4th 856, 869.))  The CLRA "shall be liberally construed."  (Civ. Code, § 1760.)

Appellants allege that HP's concealment and failure to disclose the defect in the inverters of the notebook computers violated the CLRA's provision against (1) representing that goods have characteristics which they do not have (Civ. Code, § 1770, subd. (a)(5)); (2) representing that goods are of a particular standard or quality if they are of another (*id.,* subd. (a)(7)); (3) advertising goods with the intent not to sell them as advertised (*id.,* subd. (a)(9)); (4) representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve (*id.,* subd. (a)(14); and representing that the subject of the transaction has been supplied in accordance with a previous representation when it has not (*id.,* subd. (a)(16).)

With regard to the UCL, appellants allege that HP violated the statute by "concealing and/or omitting the true facts about the defect to [appellants] and Class

---

[4] CLRA claims cannot be disposed of by motion for summary judgment.  (Civil Code, § 1781, subd. (c)(3).)  Here, appellants filed a combined motion for summary judgment and for a "no merits" determination on the CLRA claim.

members." Additionally, appellants allege that HP's violation of the CLRA by "omitting the true nature and characteristics of its notebook computers and suppressing the known defects," violated the UCL.

The purpose of the UCL is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. It defines "unfair competition" to mean and include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]. (commencing with Section 17500 et seq.)." (Bus. & Prof. Code, § 17200; see also Rushing, et al., Matthew Bender Practice Guide: California Unfair Competition and Business Torts (2014) Unfair Competition, §§ 2.03, 2.04 & 2.05.)

"The scope of the UCL is quite broad. [Citations.] Because the statute ([Bus. & Prof. Code, § 17200, defining unfair competition]) is framed in the disjunctive, a business practice need only meet one of the three criteria [unlawful, unfair or fraudulent] to be considered unfair competition. [Citation.] [¶] A cause of action for unfair competition under the UCL may be established ' "independent of any contractual relationship between the parties." ' " ( *McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1470-1471.)

Appellants argue the fraudulent concealment claims under the CLRA and the UCL are supported by the fact that HP "conceals the material fact that HP notebook computers have known defects that cause display problems." Further, appellants assert that HP was obligated to disclose the inverter defect, because it was contrary to HP's advertising about the notebooks and was material to the proper functioning of the notebook computers.

For a claim of fraudulent omission to be actionable under the CLRA, "the omission must be contrary to a representation actually made by the defendant, or an

7

omission of a fact the defendant was obliged to disclose." (*Daugherty v. American Honda Motor Co.* (2006), 144 Cal.App.4th 824, 835 (*Daugherty*).) Moreover, "[i]n order to be deceived, members of the public must have had an expectation or an assumption about the materials used" in the product. (*Bardin v. DaimlerChrysler Corp.* (2006), 136 Cal.App.4th 1255, 1275 (*Bardin*).) Appellants argue that because consumers had an expectation that the display screen of their notebooks would function properly for the duration of the notebook's "useful life," HP had a duty to disclose the material fact that the inverters were defective in manufacturing and installation. In particular, appellants assert that consumers expect a notebook computer to be portable, and a properly working display screen is essential to the notebook's portability.[5]

HP argues manufacturers do not have an independent duty to disclose a product defect absent an unreasonable risk of "physical injury or other safety concern." (*Daugherty, supra,* 144 Cal.App.4th at p. 836; see, e.g., *Bardin, supra,* 136 Cal.App.4th 1255.) HP further notes that here, the risk posed by the alleged defect in the inverters had nothing to do with a physical injury or a safety concern. Rather, the risk to the consumer was the cost to repair the notebook, and as such, it does not rise to a duty to disclose.

Both *Daugherty* and *Bardin* do address disclosure of defects related to safety concerns in the context of CLRA and UCL claims. However, neither *Daugherty* nor *Bardin* preclude a duty to disclose material information known to a manufacturer and concealed form a consumer. Specifically, in *Daugherty*, the court noted that while the

---

[5] We note that a case similar to this has proceeded through the federal courts and has been dismissed pursuant to Federal Rule of Civil Procedure, rule 12(b)(6) for failure to state a claim. (*Long v. Hewlett Packard Co.* 2007 U.S. Dist. LEXIS 79292; *Long v. Hewlett-Packard Co.* (9th Circ. Mar. 3, 2009) 316 Fed.Appx. 585 (Collectively *Long*).) This court is " 'not bound by a federal circuit court opinion. [Citation.]" (*Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 468.) Moreover, the standard for a motion to dismiss under the Federal Rule of Civil Procedure, rule 12(b)(6) is inapplicable to a motion for summary judgment under Code of Civil Procedure section 437c.

plaintiff's complaint alleged that the engine defect presented an " 'unreasonable risk' " of " 'serious potential damages,' " and that the defendant "carried on with a willful and conscious disregard of the safety of Plaintiffs . . . ," the complaint was "devoid of factual allegations showing any instance of physical injury or safety concerns posed by the defect." (*Daugherty*, *supra*, 144 Cal.App.4th 824, 836.)  The court in *Daugherty* concluded that the complaint did not state facts sufficient to support its claim that the engine defect posed a safety concern to consumers.  (*Ibid*.)

In *Bardin*, the plaintiffs alleged that a car manufacturer failed to disclose that tubular steel was used in the exhaust manifolds of certain cars instead of more durable and more expensive cast iron.  (*Bardin, supra,* 136 Cal.App.4th at p. 1260.)  The court concluded that in addition to failing to allege any safety concerns associated with the defective exhaust manifolds, the plaintiffs failed to allege any unfair conduct on the part of the auto manufacturer.  (*Ibid.*)  The *Bardin* court did not hold that a defect must be related to a safety concern to be material for purposes of fraudulent omission.

Citing *Collins, supra,* 202 Cal.App.4th 249, appellants assert that HP had a duty to disclose the defective nature of the inverters, because the defective inverters "obliterate[] the function of a computer as a computer."  In *Collins,* the defendant sold computers with defective microchips that were " 'missing [the] actual physical hardware logic that industry standards require' " and the defendant had knowledge of the defective nature of the microchips at the time the computers were sold.  (*Id*. at p. 257).  The defective microchips were material, because they corrupted floppy disks, a necessary component in the functioning of computers at the time.  The court held that the defendant failed to disclose and actively concealed the fact of this faulty microchip from consumers in violation of the CLRA and the UCL.  (*Id*. a p. 258.)

The court in *Collins* distinguished both *Daugherty* and *Bardin* in finding that the manufacturer had a duty to disclose a material defect in its product.  Specifically, the

9

*Collins* court noted that the defect in the hardware logic of the computer was the result of improper manufacturing, causing the chip to corrupt data on the user's floppy disk. The defect in *Collins* was not the result of a breakage of the product over time because of use and wear tear like the engine oil leak in *Daugherty*. In addition, unlike the metal composition of the exhaust manifolds in *Bardin*, the hardware logic in the computers in *Collins* was material, because it was central and necessary to the function of the computer as a computer. (*Collins, supra*, 202 Cal.App.4th at p. 258.)

Similarly here, appellants assert that the defect in the inverters occurred in its manufacturing and installation and was material, because it affected the performance of the display screens of notebook computers. Appellants argue that a functioning display screen is critical to a notebook computer's function, because without it, the computer would not be portable and would require the connection of an outside monitor.

HP asserts *Collins* is inapplicable because appellants do not allege that their notebooks malfunctioned out of the box; rather, the defect allegation in this case is that the inverters would malfunction at some time in the future. Indeed, the *Collins* court noted, "[t]his [is] not a situation where the microchip [is] complete and operational when sold," but wears out or breaks over time. (*Collins, supra*, 202 Cal.App.4th. at p. 254) However, while appellants' allege that the inverters were "substantially certain to fail" at some point in the future, appellants' theory is that the inverters were defective in manufacturing and installation at the time the notebooks were sold.

HP argues Degenshein and class members similar to him do not have a claim for fraudulent concealment under the UCL, because they received notebooks with inverters that functioned for the duration of the one-year warranty, and were not damaged by HP's alleged failure to disclose the fact of the faulty inverter. However, a claim for fraudulent business practices "reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general

10

public against unscrupulous business practices." (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 312.) The question under the UCL is related to HP's conduct in failing to disclose the faulty inverter, not on whether the notebook's computer functioned for one-year. HP's argument that the expiration of the warranty period precludes a claim for fraudulent concealment under the UCL is incorrect.

Moreover, whether the information about the faulty inverter is material is a question for the trier of fact. (See, e.g., *Engalla v. Pemanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 976 ["A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question' [citations], and as such materiality is generally a question of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonable find that a reasonable man would have been influenced by it."].)

Appellants point to specific misrepresentations in HP's press releases and advertising that created a duty to disclose the known defects in the notebook computers. Appellants' claim of misrepresentation is based on statements made by HP about its products in certain press releases. Specifically, appellants point to press releases from January and March 2001. In these releases, HP represented that its " 'latest . . . notebook PCs reinforce HP's commitment to providing choice customization and the latest technologies to meet the diverse needs of today's customers,' " and that the notebooks fall within HP's tradition of " 'reliable, manageable, stable, secure and expandable products.' "

While it is true that "[s]ellers are permitted to 'puff' their products by stating opinions about the quality of the good so long as they do not cross the line and make factual representations about important characteristics like a product's safety." (*Osborne v. Suburu of America, Inc.* (1988) 198 Cal.App.3d 646, 660, fn. 8.) The question of

11

whether a manufacturer's representation about a product is specific, and was relied upon by a consumer should be decided by a trier of fact. Here, Giuliano-Ghahramani alleged that she purchased her notebook based on an HP advertisement she saw. In addition, Giuliano-Ghahramani produced the advertisement and testified that she purchased the notebook because of the display screen shown and described in the ad, noting that the HP notebook screen "was a larger screen at the time." Appellants' evidence is sufficient to create a triable issue of fact as to the nature of HP's representations, and whether that triggered a duty to disclose the defect.

### *Evidence of Defect and HP's Knowledge*

We note at the outset that as the moving party, HP has not met its burden to show that "one or more elements of a cause of action, even if not separately pleaded, cannot be established . . . ." (Code Civ. Proc. § 473c, subd. (p)(2).) "[A] moving defendant who claims that the plaintiff cannot prove all the elements of his case must present evidence to support his claim. The defendant cannot simply challenge the plaintiff to prove his case by opposition." (*Y.K.A., supra,* 174 Cal.App.4th at p. 353, citing *Aguilar, supra*, 25 Cal.4th at pp. 854-855.) Here, appellants alleged that HP omitted and concealed from them material information about the notebooks in violation of the CLRA and the UCL. HP has not presented evidence as the elements of this claim, including materiality or consumer expectations.

In support of their claim of defect in manufacture and installation of the inverters, appellants submitted the declaration of Eric Langberg, an engineering expert who opined that all of the Zinfandel 3.5 computers, and 42,000 Zinfandel computers contained TDK inverters that had an insufficient fuse rating, and as result, the backlights would not receive adequate power to light the screens. Langberg also offered the opinion that an inverter "has an indefinite useful life," such that a failure of an inverter at any time would be premature. Langberg opined that the mounting hole for the Ambit inverters is located

12

too close to the integrated circuit, and the location of the integrated circuit leads to early failure of the inverter. In addition, Langberg offered the opinion that the amount of force used to mount the Ambit inverters caused cracks in the soldering of the integrated circuit.

HP points to the fact that Langberg did not identify any actual inverter malfunction in any of the class members' notebook computers, other than Degenshein's. In addition, Langberg stated: "[f]rom a statistical reliability standpoint, I do not have an opinion on notebook computer useful life." Langberg said that he could not put a percentage onto the phrase "substantially certain to prematurely fail." Langberg said that he had no basis for rendering an opinion when an inverter failure would be premature versus not premature. Langberg also stated that he had no way to know how many 3.5 and 4.0 notebooks had failed inverters because the repair data does not provide for "what's actually happening in the field." Langberg had no opinion as to when HP knew of any defects in the TDK or Ambit inverters in the notebook computers.

Langberg's opinion evidence creates a triable issue of fact as to whether the TDK inverters were defective and whether the Ambit inverters were installed incorrectly. Despite the fact that Langberg provided no evidence of what "substantially certain to fail" means, no opinion of what it would mean for an inverter to fail prematurely, and no explanation of what constitutes a computer's "useful life," he did provide evidence from which a reasonable trier of fact could conclude that the inverters were defective.

As to HP's knowledge of the defect, appellants present an e-mail from David Lee, an HP engineer, stating that at the "Zinfandel Platform Team" meeting on January 8, 2002, HP addressed the electrical and mechanical engineering problems of the TDK that inverters were causing backlight failures in Zinfandel 3.0 and 3.5 computers. The electrical engineering problem with the Zinfandel 3.5 computers was traced to TDK inverters with an "insufficient margin on fuse rating." As a result of this discovery, on April 15, 2002, HP issued a service note to Compal, the Taiwanese Original Design

13

Manufacturer (ODM) who manufactured the notebooks for HP. The TDK note provided that the TDK inverters had a "blown" fuse that resulted in no backlight to the display screen on the computer. The note required that the TDK inverters in Zinfandel 3.5 computers that were submitted for repair to Bizcom, Inc. (Bizcom), HP's authorized repair center, be replaced with inverters manufactured by Ambit.

With regard to the Ambit inverters, appellants present evidence of a second service note[6] that was issued in November 2003, and related to the Ambit inverters that Bizcom installed as replacements in Zinfandel computers. This second service note applied to all Zinfandel notebooks, regardless of version (i.e., 3.0, 3.5 or 4.0) service history or actual inverter failure. This service note stated that the torque setting of Bizcom's automated screwdrivers used to install the Ambit inverters was too high, resulting in solder cracking on the inverters. The note instructed Bizcom to reduce the torque setting on the screwdrivers for future repairs.

Appellants also point to the call center data[7], as well as the Bizcom repair data to show that HP notebooks contained defective inverters, and that HP was aware of the same. Langberg analyzed the data, and stated that during the period from January 2002 and December 2003, the number of notebooks submitted for service per month for

---

[6] At HP's motion for summary adjudication of Degenshein's claims, HP objected to the admission of the Ambit service note as a "subsequent remedial measure" under Evidence Code section 1151. The court sustained the objection. This was error. The Ambit service note was offered to show defect in the installation of the inverters. It was not offered to show negligence on the part of HP, and therefore, Evidence Code 1151 does not apply.

It should also be noted that at HP's subsequent motion for summary adjudication of Giuliano-Ghahramani's and the class claims, HP did not object to the Ambit service note, and it was admitted as evidence.

[7] Call center data refers to "anybody who calls HP, the 800 number, who has a question . . . the call service representative . . . enters an entry when that call happens . . . ."

14

inverter replacement ranged from 0 percent to .8 percent.  In most months during that same period, the percentage of notebooks submitted for inverter repair was less than .5 percent.  However, the failure rate of .8 percent noted in February 2002, increased to 1.0 percent in April 2002.

HP argues that because a dim, dark or flickering display can be caused by many things, including liquid spills and customer misuse, there is no way to extrapolate proof of defective inverters from call center data complaining of display screen problems, or Bizcom repair data.  However, Langberg's analysis of the increase in inverter failure over time could lead a reasonable trier of fact to conclude that the inverters were defective, and that HP was aware of the defect.

We find appellants' evidence creates a triable issue of fact as to whether the TDK and Ambit inverters were defective and whether HP had knowledge of the defects. Langberg's testimony creates a triable issue of fact as to whether the TDK inverters were defective because they had an insufficient fuse rating, and whether the Ambit inverters used to replace the TDK inverters were installed incorrectly.  The call center data and service data demonstrating an increase in inverter failure over time, coupled with Langberg's analysis of the data create a triable issue of fact as to whether HP knew about the defects and if so, when. In addition, the occurrence of the HP meeting on January 8, 2002 to address the electrical engineering problems with the TDK inverters, and the continued shipment of Zinfandel 3.5 notebooks containing those inverters for the three months following, creates a triable issue of fact as to whether HP knew about the defect in the TDK inverters and concealed this fact from the consumers who purchased notebooks containing the TDK inverters.  Finally, the Ambit service note, coupled with the evidence of the procedure by which HP issues a service note creates a triable issue as to when HP knew about the defect in the Ambit inverter installation.

15

HP is not entitled to judgment as a matter of law as to the UCL claims, and is not entitled to a no merits determination as to the CLRA claims in the First and Second Amended Complaints.

### *Breach of Express Warranty*

The one-year warranty for the notebook computer states, in relevant part: "HP warrants to you, the end-user customer, that HP hardware, accessories, and supplies will be free from defects in materials and workmanship after the date of purchase, for the period specified in the Warranty Duration table below. HP Pavilion and Omnibook XE Series Notebooks typically come with a standard one-year warranty. Please see the Warranty Duration table for more details. If HP receives notice of such defects during the warranty period, HP will at its option, either repair or replace products which prove to be defective. Replacement products may be either new or equivalent in performance to new. [¶] . . . [¶] . . . HP does not warrant that the operation of HP products will be uninterrupted or error free. If HP is unable, within a reasonable time, to repair or replace any product to a condition as warranted, you will be entitled to a refund of the purchase price upon prompt return of the product."

For notebook computers presented to HP for repair during the one-year warranty stated above, HP also provided a 90-day repair warranty for materials and work at no charge to the purchaser. The repair warranty provided that if the product was returned to HP within 90 days of a repair, it would "correct any defects in materials or workmanship used in the repair." In addition, customers were given the option of purchasing extended warranty and service packages at the time of the original purchase of the notebook.

The primary difference between the first amended complaint and the second amended complaint is the breach of express warranty cause of action. The first amended complaint alleges that Degenshein did not submit his notebook for repair to HP until after

16

his one-year warranty had expired.  The second amended complaint alleges that Giuliano-Ghahramani submitted her notebook for repair before her one-year warranty had expired.

### *Degenshein*

It is undisputed in this case that Degenshein did not notify HP until 14 months after he purchased his notebook; two months after the expiration of the one-year warranty.  Appellant asserts that Degenshein's late notice of his defective computer was not fatal to his breach of express warranty claim, because HP had "constructive notice" of the display screen problems based on other customer complaints about other notebook computers in HP's product line.  In addition, appellant asserts that the inverters were substantially certain to fail during the notebook's "useful life," and that HP knew this would occur at the time the notebooks were sold.

The warranty at issue in this case is clear that it applies to the end-user, and provides that the product "will be free from defects in materials and workmanship after the date of purchase, for the period specified in the Warranty Duration table below."  The word "defects" in the warranty clearly refers to defects in the end-user's computer, as opposed to other computers purchased by other customers on earlier or later dates.  In addition, the warranty provides for HP's obligation to repair or replace defective products only if HP "receives notice of such defects during the warranty period . . . ."

Appellants' argument is contradictory to *Daugherty, supra,* 144 Cal.App.4th 824, which held that "[a] warranty is a contractual promise from the seller that the goods conform to the promise."  (*Id.* at p. 830.)  In *Daugherty*, the plaintiffs argued that Honda's warranty did not require discovery of the defect during the warranty period if Honda was aware of the defect at the time of sale.  The court rejected the plaintiffs' argument, noting that numerous courts have found that a latent defect that is discovered *after* the express warranty has expired cannot form the basis for a breach of express warranty claim.  (*Id.* at pp 831-832.)

17

The court in *Daugherty* reasoned: ". . . in giving its promise to repair or replace any part that was defective in material or workmanship and stating the car was covered for three years or 36,000 miles, Honda 'did not agree, and plaintiffs did not understand it to agree, to repair latent defects that lead to a malfunction after the term of the warranty.' " (*Daugherty, supra,* 144 Cal.App.4th at p. 832.) The court stated further: " '[v]irtually all product failures discovered . . . after expiration of the warranty can be attributed to a "latent defect" that existed at the time of sale or during the term of the warranty. All parts will wear out sooner or later and thus have a limited effective life. Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time[, and] can always be said to "know" that many parts will fail after the warranty period has expired. A rule that would make failure of a part actionable based on such "knowledge" would render meaningless time/mileage limitations in warranty coverage.' " (*Daugherty, supra,* 144 Cal.App.4th at 830, quoting *Abraham v. Volkswagen of Am., Inc.* (2d Cir. 1986) 795 F.2d 238, 250.)

Appellants rely on *Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908 (*Hicks*) for the proposition that the one-year time limit of HP's express warranty should not bar claims of defects discovered after expiration, because the inverters in HP's notebooks were "substantially likely to fail" during the notebooks' "useful life." In *Hicks*, homeowners sued their builders for faulty foundations in their homes. The court concluded that "proof of breach of warranty does not require proof the product has malfunctioned but only that it contains an inherent defect which is substantially certain to result in malfunction during the useful life of the product." (*Id*. at p. 918.) The *Hicks* court further stated: "Foundations . . . are not like cars or tires. Cars and tires have a limited useful life. . . . A foundation's useful life, however, is indefinite." (*Id*. at p. 923, fn. omitted.)

18

*Hicks* is readily distinguished from the present case. The court's rationale in *Hicks* focused on the lifespan of a home foundation, and the fact that the defect in the foundation could manifest in a malfunction at any time during that lifespan. As a result, the duration of the express warranty was not dispositive of a claim of defect. Here, unlike a home foundation with an indefinite useful life, a computer, like a car or tires, has limited useful life.

Applying the rationale of *Daugherty* to the present case, HP is not liable for breach of warranty for those claims made after the expiration of the one-year warranty period. The warranty in this case required the end-user to notify HP during the warranty period. It is undisputed that Degenshein did not notify HP of the problem with his computer until after his one-year warranty had expired. Moreover, HP's putative knowledge of a potential failure of a product in the future or of a latent defect that could cause product failure down the road does not alter the one-year time limits provided in the express warranty as appellants suggests. (See, e.g., *Daugherty, supra*, 144 Cal.App.4th at p. 830.) Appellants' interpretation of the warranty suggesting that constructive notice would satisfy the notice requirement is unreasonable and would not effectuate the intent of HP and the end-user. "A contract must receive such an interpretation as will make it . . . reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code § 1643.)

Because it is undisputed that Degenshein did not notify HP about a problem with his display screen until after his one-year warranty had expired, his claim for breach of warranty fails, and HP is entitled to judgment as a matter of law as to Degenshein's breach of warranty cause of action.

### *Giuliano-Ghahramani*

Unlike Degenshein, Giuliano-Ghahramani notified HP of a problem with the display screen of her notebook computer within the one-year warranty period.

19

Specifically, Giuliano-Ghahramani purchased her notebook in January 2002, and notified HP about problems with her display screen in November 2002. In response, HP replaced the inverter. Giuliano-Ghahramani notified HP about display screen problems a second time in December 2002, and HP again replaced the inverter. Finally, Giuliano-Ghahramani notified HP in June 2003 about display screen problems after the expiration of the one-year warranty, and the 90-day repair warranty. HP did not repair Giuliano-Ghahramani's notebook outside of the warranty period.

Giuliano-Ghahramani asserts that there is a triable issue of fact as to whether HP actually repaired her notebook computer in 2002 when she twice presented it to HP for display screen problems during the warranty period. Specifically, although Giuliano-Ghahramani stated that the notebook worked "great" after HP returned it to her during the warranty, the fact that the notebook had display screen problems in June 2003 after the warranty had expired demonstrates that HP's repair during the warranty was insufficient. Giuliano-Ghahramani asserts that when she submitted her notebook to HP, HP replaced her inverter with other defective inverters.

Giuliano-Ghahramani points to the TDK and Ambit service notes of April 2002 and November 2003, respectively as evidence that HP's repair of her notebook during the one-year warranty was not adequate. Specifically, she argues that as directed by the TDK service note, the TDK inverter in her notebook was replaced with an Ambit inverter when she submitted the notebook for repair during the one-year warranty period. She asserts that pursuant to the Ambit service note, Bizcom used a screwdriver that had torque settings that were too high. As a result, Giuliano-Ghahramani argues, HP did not adequately repair her computer under the warranty.

Here, under the terms of the warranty, HP replaced the inverter in Giuliano-Ghahramani's computer and returned it to her in operative condition. However, Giuliano-Ghahramani's computer malfunctioned again during the warranty, and HP again replaced

20

the inverter. Giuliano-Ghahramani argues HP breached the warranty because it replaced one faulty inverter with another. Therefore, it did not return her computer to her in a condition as warranted, namely, to be free from defect. In fact, the computer was returned to her in a defective condition, which was a breach of warranty.

HP asserts that because Giuliano-Ghahramani's notebook continued to function throughout the duration of the one-year warranty period, HP complied with its warranty. HP further argues that the fact that Giuliano-Ghahramani's notebook malfunctioned six months after the expiration of the warranty is not a consideration in a breach of warranty claim. *Daugherty* makes it clear that that a plaintiff cannot maintain a breach of warranty claim for a product that is repaired within the warranty period and fails again months after the warranty has expired. (*Daugherty,* 144 Cal. App. 4th at pp. 830-832.) If the result were otherwise, it " 'would change the landscape of warranty and product liability law in California. Failure of a product to last forever would become a "defect," a manufacturer would no longer be able to issue limited warranties, and product defect litigation would become as widespread as manufacturing itself.' " (*Daugherty, supra* 144 Cal. App. 4th at p. 829.)

Appellants' claim for breach of express warranty with regard to Giuliano-Ghahramani is distinct from that in *Daugherty*. Specifically, appellants do not base their claim for breach of warranty on the fact that Giuliano-Ghahramani's notebook had a defect that manifested outside the warranty period. Appellants argue that HP breached its warranty by replacing one faulty inverter for another. As a result, HP failed to adequately repair Giuliano-Ghahramani's notebook, and did not return it to her in the condition as warranted.

In support of their argument that failure to repair can form a basis for a breach of warranty claim, appellants cite cases dealing with inadequate repairs under the Song-Beverly Consumer Warranty Act (Civ. Code § 1790, et seq.). These cases include *Jensen*

21

*v. BMW of North America, Inc*. (1995) 35 Cal.App.4th 112 (*Jensen*), *Oregel v. American Isuzu Motors, Inc*. (2001) 90 Cal.App.4th 1094, and the recent case of *Donlen v. Ford Motor Comp*any (2013) 217 Cal.App.4th 138 (*Donlen*).[8]  All of these cases involved multiple unsuccessful attempts to repair the consumers' cars within the warranty period and addressed the question of whether there was substantial evidence to support a finding of inadequate repair.

While the present case does not encompass a claim for violation of the Song-Beverly Act, the cases appellants cite are illustrative of what constitutes a failure to repair. In *Jensen*, the plaintiff experienced a recurring brake problem with her BMW, and she returned the car to the dealer for repair multiple times.  (*Jensen, supra*, 35 Cal.App.4th at p.p. 120-121.)  The brake problem persisted and Jensen sought relief under the Song-Beverly Act for failure to repair.  After a jury returned a verdict for Jensen, BMW appealed, arguing there was insufficient evidence to support a finding that BMW failed to adequately repair her car.  (*Id*., at p. 134.)  The Court of Appeal affirmed, finding that there was substantial evidence to support the jury's finding of failure to repair. (*Id*., at p. 135)  Specifically, the court noted that Jensen experienced the same brake problem after each repair attempt, BMW had issued a service bulletin to dealerships alerting them to the brake problem, and there was expert testimony that the brake problem persisted.  (*Ibid*.)

There are factual similarities between the present case and *Jensen*.  Giuliano-Ghahramani presented evidence that she continued to experience the same display screen problems after submitting her notebook for repeated repairs, evidence of the Ambit service note that provided that the torque setting for the screwdrivers being used to replace the inverters was too high and caused cracking of the solder joint, and expert opinion of

---

[8]  *Donlen* was brought to this court's attention by appellants' letter brief filed June18, 2013.

Langberg stating that using too much torque on an already defective inverter design would cause cracking that would continue to worsen until complete failure of the inverter.

The evidence in this case creates a triable issue as to whether HP adequately repaired Giuliano-Ghahramani's notebook when she submitted it to HP two times during the one-year warranty. While HP focuses its argument on the fact that Giuliano-Ghahramani stated that the notebook worked "great" when it was returned to her, there is evidence showing that the notebook continued to have the same flickering display screen problems after both repair attempts. In addition, there is evidence that when Giuliano-Ghahramani's notebook failed six months after the expiration of the warranty, it was because of the faulty inverter. This repeated failure of Giuliano-Ghahramani's notebook following two repair attempts could lead a reasonable trier of fact to find that HP failed to adequately repair her notebook.

We find there is a triable issue of fact as to Giuliano-Ghahramani's breach of express warranty claim. The evidence here creates a triable issue as to whether HP complied with its warranty by replacing a faulty inverter with another faulty inverter, and returning Giuliano-Ghahramani's notebook to her in a defective condition. The fact that Giuliano-Ghahramani's notebook continued to present the same flickering display screen problems after two repair attempts, and ultimately failed because of the faulty inverter creates a triable issue as to whether HP complied with its warranty. HP is not entitled to judgment as a matter of law as to the breach of express warranty claims.

### Class Certification Orders

Appellants assert the court erred in failing to certify a nationwide class, and in denying certification of the CLRA claims

### Denial of Nationwide Class-Factual Background

In 2005, Rutledge and Degenshien moved for class certification of the breach of express warranty, violation of the UCL and unjust enrichment claims; they did not seek

23

certification of the CLRA claims. In the motion, Rutledge and Degenshein alleged that Zinfandel 3.5 and 4.0 notebook computers released from December 2001 until November 2002 contained inverters that were substantially certain to fail during the "useful life" of the computer. In addition, the motion alleged that HP knew of the defect in the display screen components in the computers at the time of class members' purchases beginning in December 2001.

In 2007, the trial court certified a class consisting of only California residents, denying appellants' request for a nationwide class.[9] As a result, Degenshein was designated as the only class representative. The certified class was defined as "[a]ll persons or entities who own or owned one or more of the following HP Pavilion notebook models: zt1150; zt1155; zt1170; zt1175; zt1108; zt1185; zt1190; zt1195; zt1250; xz185; xz275; and xz295; containing a TDK TAD669 Rev. 2.0 inverter or an Ambit inverter, part numbers PK070012310 and PK070011210; who purchased the notebook from an entity located in California; and who experienced a dim, dark, or flickering display."

### *Analysis*

Appellants argue on appeal that the trial court erred in limiting the class to only California residents, rather than HP consumers nationwide.

"Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification. . . . [citations] . . . . [Accordingly,] a trial court ruling supported by substantial evidence generally will not be disturbed 'unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation]' [citation].' " (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435-436.)

---

[9] HP challenged the trial court's certification of the class. This court affirmed the trial court's class certification order in *Hewlett-Packard Co. v. Superior Court, supra,* 167 Cal.App.4th 87.

In denying appellants' request to certify a nationwide class, the court found that appellants: "fail[ed] to establish the constitutionality of applying California law to out-of-state class members' claims. [Appellants] also fail[ed] to persuasively articulate why California has a special obligation that would fairly call for it to assume the burden of adjudicating a nationwide class action. The purchases occurred at local retail stores in a multitude of jurisdictions. Presumably consumers would have exercised their warranty rights under their respective states' laws. Further, there appear to be warranty issues unique to some jurisdictions. [Appellants] fail[ed] to provide sufficient information or a satisfactory assessment as to how the state law differences may be managed fairly and efficiently."

A nationwide class is proper under constitutional law when a state has " 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [forum] is not arbitrary or unfair." (*Phillips Petroleum Co. v. Shutts* (1985) 472 U.S. 797, 821-822.) Appellants point to the significant contacts California has with the claims asserted against HP that justify the application of California law under constitutional law principles. Specifically, HP a has national advertising campaign that was created by a California agency. HP's contracts with Compal for the production of the computers were governed under California law. HP's designated service provider for computer repairs, Bizcom, is located in California. Finally, certain HP witnesses are located in California, including David Lee, who approved the service notes at issue in this case. Mr. Lee works in HP's Mobile Computing Division located in Cupertino.

Appellants argue on appeal that the court erred in finding that California did not have sufficient contacts to the claims of the class members such that California law should apply to non-resident plaintiffs. Appellants cite cases of California computer manufacturers that have been included in nationwide class actions. (See, e.g. *Wershba v.*

25

*Apple Computer, Inc.* (2001) 91 Cal.App.4th 224 (*Wershba*); *Wolph v. Acer America Corp.* (2011) 272 F.R.D. 477 (*Wolph*).) Appellants argue the same result should be applied in this case, namely, that the court should certify a nationwide class.

In *Wershba,* plaintiffs sued Apple Computer for violations of the UCL and the CLRA in connection with Apple's decision to terminate free technical support promised to purchasers of certain Apple products. (*Wershba, supra*, 91 Cal.App.4th at p. 231.) This court found that a nationwide class was appropriate for settlement of the action because the plaintiffs had established that California had sufficient contacts with the claims against Apple such that application of California law would be constitutionally appropriate. (*Id*. at p. 244.) In arriving at that conclusion, this court considered the fact that Apple is a California corporation, with its principle place of business in Cupertino, the brochures promising free technical support were made and distributed from California, and the policy to terminate the technical support at issue in the case was made at Apple's headquarters in California. (*Id*. at p. 242.)

Moreover, in *Wolph*, the court found a nationwide class proper because the warranty contracts at issue contained an express California choice-of-law provision, the computers that were alleged to be defective were designed, developed and tested in California, and the decisions about retail sales of the computers were made in California. (*Wolph, supra*, 272 F.R.D. at pp. 484-485.)

The facts of *Wershba* and *Wolph* are similar to the present case. HP's headquarters and principle place of business is California, policy decisions regarding the notebooks at issue, including issuing the service notes, were made in California, and all of the warranty repairs were performed in California. As such, appellants established sufficient contacts with California as to each class member's claims such that application of California law to non-resident plaintiffs would not be "arbitrary and unfair." (*Phillips Petroleum Co., supra,* 472 U.S. at pp. 821-822.)

26

Moreover, choice-of-law rules, under which the trial court determines whether the law of other states is materially different and whether other states have an interest in having their law applied, support the application of California law to a nationwide class. (See, e.g., *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 919 (*Washington Mutual*).) The state where the injury occurs has a " 'predominant interest' " in applying its law. (*McCann* v. *Foster Wheeler LLC,* (2010) 48 Cal.4th 68, 98 (*McCann*).) In addition, Civil Code section 1646, provides that "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." (Civ. Code § 1646.) Here, appellants' allege that HP failed to comply with its repair obligations under the express warranty. As such, the alleged injuries occurred in California where HP conducted the repairs, and California has the " 'predominant interest' " in applying its law. (*McCann, supra,* 48 Cal.4th at p. 98.)

Here, in denying certification of a nationwide class, the court noted that application of California law to non-resident plaintiffs would not be appropriate to the extent that consumer protection laws differ in other jurisdictions, potentially affording plaintiffs better remedies or more claims. The court stated: "[y]ou're asking the court to apply California law and that may be appropriate except to the extent it may deprive somebody of a cause of action he would otherwise have." The court further noted that application of California law to non-resident plaintiffs would be inappropriate "to the extent that we would be depriving somebody of a right where they acquired their computer in another jurisdiction, perhaps from a retailer, or who knows where, and they're governed by other laws in those jurisdictions."

The same rationale cited by the trial court was rejected by this court in *Wershba ,* noting, "California's consumer protection laws are among the strongest in the country." (*Wershba, supra*, 91 Cal.App.4th at p. 242.) This court cited *Clothesrigger Inc. v. GTE*

*Corp.* (1987) 191 Cal.App.3d 605 (*Clothesrigger*) for the proposition that California courts may apply California's pro-consumer laws to non-residents, stating, " 'California's more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery.' " (*Wershba, supra*, 91 Cal.App.4th at p. 243, citing *Clothesrigger, supra,* 191 Cal.App.3d at p. 616.)  The court in *Wolph* found similarly, stating, "California's interest in having its consumer protection laws applied to claims involving those notebooks outweigh any other particular state's interest in have its laws applied." (*Wolph, supra*, 272 F.R.D. at p. 486.)

Here, because California has sufficient contacts to the claims of the class members to meet constitutional standards, the burden was on HP to demonstrate that the interests of other state's laws were greater than California's interests.  (See *Wershba, supra*, 91 Cal.App.4th at p. 244; *Washington Mutual, supra*, 24 Cal.4th at p. 921.)  Other than to refer to the possibility that other jurisdictions have differing warranty laws that could affect consumers disparately, the court did not address whether HP met its burden of demonstrating that the interests of other state's laws were *greater* than California's, nor did it make such finding.

Moreover, the court improperly placed the burden on appellants "to persuasively articulate why California has a special obligation that would fairly call for it to assume the burden of adjudicating a nationwide class action."  The same reasoning was rejected in *Clothesrigger*, where the trial court denied nationwide class certification because "California had no interest in becoming the 'savior' of the other 49 states." (*Clothesrigger, supra*, 191 Cal.App.3d at p. 613.)  Such consideration was not proper under choice-of-law rules.

We find the trial court's order denying nationwide class certification must be reversed.  The record shows that California had sufficient contacts with the claims such

28

that California has an interest in applying its laws to nonresident plaintiffs satisfying constitutional principles. In addition, HP did not satisfy its burden of showing that other state's interests in applying their law were greater than California's. Here, the court improperly used the possibility of differing warranty laws as a reason to deny nationwide certification without considering whether other jurisdictions had an interest in applying those laws. Finally, the court improperly required appellants to demonstrate why California had a "special obligation" in applying its consumer protection laws to nonresident plaintiffs. Such consideration is not a proper one for a choice-of-law analysis.

### *Denial of Class Certification of CLRA Claims-Factual Background*

In between the first and second motions for class certification, appellants moved for summary adjudication of some of HP's affirmative defenses. The court granted the motion as to the following affirmative defenses asserted by HP: accord and satisfaction, intervening and superseding events, acts of third parties, and failure to mitigate.

Appellants filed a second motion for class certification seeking to certify the CLRA claims for class treatment. The court denied the motion, reasoning that Degenshein's failure to request certification of the CLRA claims estopped Giuliano-Ghahramani from requesting such certification, and that certification would present one-way intervention issues given the adverse adjudication of HP's affirmative defenses.

### *Analysis*

In denying appellants' request for certification of its CLRA claims, the court determined that such certification was improper under *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069 (*Fireside Bank*) and its prohibition against one-way intervention. The court noted that "class certification issues must be resolved prior to any merits determination." In addition, the court noted that appellants could have moved for

29

certification of the CLRA claims "years ago" and "have failed to adequately explain why they did not do so and should be allowed to do so now."

The problem of one-way intervention occurs when "not-yet-bound absent plaintiffs may elect to stay in a class after favorable merits rulings but opt out after unfavorable ones." (*Fireside Bank, supra,* 40 Cal.4th at p. 1074.) Thus, "trial courts in class action proceedings should decide whether a class is proper and, if so, order class notice before ruling on the substantive merits of the action." (*Ibid.*) The doctrine is designed to prevent class members from taking advantage of favorable rulings while avoiding any res judicata effect of unfavorable ones, essentially picking and choosing how to proceed based on how the merits of the class litigation unfold.

Certifying new class claims in a case such as this where the court had already made decisions on the merits would violate the proscription against one-way intervention, in that "potential members of the class can reserve the decision to become part of the class" until after the court has made decisions on the merits of the case. This creates the "classic no-win option" for the HP. (*Home Savings v. Superior Court* (1974) 42 Cal.App.3d 1006, 1011.) Moreover, certifying a new class claim would subject HPs to " ' " 'an open-ended lawsuit that cannot be defeated, cannot be settled, and cannot be adjudicated.' " ' " *Fireside Bank, supra,* 40 Cal.4th at 1081.)

We find the court properly denied appellants' request to certify the CLRA claims, and the order was supported by substantial evidence. At the time of appellants' request, the court had already ruled that HP was precluded from asserting some of its affirmative defenses. If the court allowed the requested certification, newly added class members could join the class with the benefit of knowing that HP would be barred from raising the adjudicated defenses. The order denying certification of the CLRA claims will not be disturbed on appeal.

30

*Discovery Sanctions*

Appellants dispute three orders of the trial court regarding discovery sanctions. The first is an order of the trial court sanctioning appellants for an untimely motion to compel compliance with a subpoena of a third party. The other two orders denied appellants' request for evidentiary sanctions against HP.

*Monetary Sanctions Against Appellants*

Appellants assert the court erred in ordering $4,000 in monetary sanctions against them in connection with their 2011 motion to compel documents requested in their July 2004 deposition subpoena of Bizcom.[10] Appellants argue the sanctions were not appropriate because their motion to compel was not untimely, they presented colorable arguments to the trial court regarding the timeliness of the motion, and the sanctions order violated due process.

*Factual Background*

Appellants brought a motion to compel production of documents originally demanded in a July 2004 subpoena of Bizcom. The motion to compel was filed in February 2011. The court deemed the motion untimely based on Code of Civil Procedure section 2025.480, subdivision (b), and while Bizcom requested monetary sanctions in the amount of $38,673.25, the court ordered sanctions in the reduced amount of $4,000.

The record shows that appellants served a deposition subpoena on Bizcom on July 2, 2004 that contained 14 document requests. Bizcom produced documents and served objections on August 27, 2004. Appellants did not contact Bizcom again until nearly two years later in April 2006. At that time, appellants noted that Bizcom " 'responded to [the] subpoena in 2004,' " and that Bizcom " 'worked amicably . . . to respond to that subpoena.' " Appellants further informed Bizcom that they would be

---

[10] Neither HP, nor Bizcom assert arguments on appeal regarding this sanctions order. Bizcom appeared oral at argument. We denied its request to argue, because Bizcom did not file a brief in this case.

31

serving a second subpoena seeking " 'a subset' " of the documents requested in 2004. Bizcom served objections to the second subpoena request on April 14, 2006, and produced the documents requested on May 1, 2006. Four years later, in 2010, Appellants again contacted Bizcom stating their belief that Bizcom left out certain documents requested in the 2004 and 2006 requests. Appellants served three separate subpoenas on Bizcom, and on August 24, 2010, Bizcom served objections. After participating in an informal discovery conference in the trial court, Bizcom produced additional documents on September 20, 2010. Appellants were not satisfied and sought additional documents. Ultimately, appellants served the motion to compel on February 11, 2011.

### *Analysis*

"A trial court has broad discretion when imposing a discovery sanction. Accordingly, the trial court's order will not be reversed on appeal in the absence of a manifest abuse of discretion that exceeds the bounds of reason . . . ." (*Lee v. Lee* (2009) 175 Cal.App.4th 1553, 1559 (*Lee*).) The appellant bears the burden on appeal of demonstrating that the trial court abused its discretion in imposing a discovery sanction. (*Young v. Rosenthal* (1989) 212 Cal.App.3d 96, 114-115.)

Code of Civil Procedure section 2025.480, subdivision (b) provides that a motion to compel further answers from a deponent "shall be made no later than 60 days after the completion of the record of the deposition . . . ." Code of Civil Procedure section 2025.480, subdivision (j) provides, "The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to compel an answer or production, unless it finds that the one subject to the sanctions acted with substantial justification or that other circumstances make the imposition of the sanction unjust."

Appellants assert the court erred in ordering the sanctions, because the 2011 motion was not untimely. Appellants cite *Unzipped Apparel, LLC v. Bader* (2007) 156

32

Cal.App.4th 123 (*Unzipped*) in arguing that because Bizcom agreed to produce documents in the deposition, they "can rest assured that the 60-day period [during which it must bring a motion to compel] does not begin to run until the production is over." Appellants argue that Bizcom's production of documents from the July 2004 deposition was not complete at the time of the motion, and as a result, the 60-day period for filing a motion to compel had not run, and their 2011 motion was timely.

In *Unzipped*, the court specifically noted that for a business record subpoena, such as the subpoena of Bizcom at issue here, the 60-day period during which a motion to compel must be filed, begins to run when the deponent serves objections on the party. At the time the objections are served, the record of deposition is complete. (*Unzipped, supra*, 156 Cal.App.4th at p. 136.) In reference to the 60-day period, the *Unzipped* court noted that "the deadline is mandatory." (*Ibid.*)

Based on our review of the record, appellants' February 2011 motion to compel was untimely. Appellants continued to seek documents requested in their 2004 subpoena of Bizcom for seven years. If appellants were not satisfied with Bizcom's production of documents from its initial request, the time to file a motion to compel was within 60 days of August 27, 2004, the date on which Bizcom served its objections to the 2004 subpoena.

The court did not err in finding appellants' motion untimely under Code of Civil Procedure Section 2025.480, subdivision (b), and in ordering the monetary sanction under Code of Civil Procedure Section 2025.480, subdivision (j). The court did not abuse its discretion in concluding that appellants did not act with substantial justification in bringing the untimely motion. Contrary to appellants' assertion, there is no due process violation in the sanctions order in this case. Appellants were on notice under Code of Civil Procedure Section 2025.480, subdivision (j) of a mandatory sanction for unsuccessfully making a motion to compel.

33

*Denial of Evidentiary Sanctions Against HP*

Appellants sought two evidentiary orders as discovery sanctions against HP. First, appellants sought an order establishing that the TDK and Ambit inverters were substantially certain to fail. In addition, appellants sought an order establishing that HP was on notice of and had knowledge of the defective nature of the TDK and Ambit inverters as of January 15, 2002.

*Factual Background*

The specific discovery at issue in this case was related to monthly reports of customer calls to HP that were described by HP's witness, Richard Chiaramonte at his deposition. Mr. Chiaramonte described reports that contained raw numbers of overall call center traffic with respect to all of HP's consumer products.

At the hearing on the motion for sanctions, the court asked appellants to provide a declaration from their expert, describing what information was missing from HP's production of documents related to call data that would be relevant. The court stated: "[a]nd [appellant]s' counsel, you have got, I presume, at this point, an expert retained who has reviewed materials . . . . [¶] . . . [¶] . . . I want a declaration from that expert that tells the Court what that expert thinks he or she needs to testify at trial and which they haven't received. In other words, if they say I don't—I can't issue an opinion because I am missing X, Y, and Z. Appellants did not provide the requested information to the court.

*Analysis*

As stated above, a trial court has broad discretion when imposing a discovery sanction. (*Lee, supra,* 175 Cal.App.4th at p. 1559.) Although the court has discretion in choosing a sanction, this discretion must be exercised in a manner consistent with the basic purposes of such sanctions, e.g., to compel disclosure of discoverable information. (*Marriage of Economou* (1990) 224 Cal.App.3d 1466, 1475.) Courts have continued to

34

uphold the principle cited in *Caryl Richards, Inc. v. Superior Court* (1961) 188 Cal.App.2d 300, that sanctions may not be imposed solely to punish the offending party. (*McGinty v. Superior Court* (1994) 26 Cal.App.4th 204, 214 (*McGinty*) ["punishment is not an appropriate aim of discovery sanctions"].)  Furthermore, the sanction chosen should not provide a windfall to the other party, by putting the prevailing party in a better position than if he or she had obtained the discovery sought and it had been favorable. (*Deyo v. Kilbourne* (1978) 84 Cal.App.3d. 771, 793; *McGinty, supra*, 26 Cal.App.4th at p. 214.)

Appellants argue the court abused its discretion in failing to order the evidence sanctions they sought.  In support of this assertion, appellants point to the fact that over the course of litigation in this case, the court ordered HP to respond to appellants' discovery requests at least seven times, and appellants sought and obtained six orders to enforce prior orders.

On appeal, appellants do not demonstrate that the court's refusal to order their requested evidentiary sanctions constituted "manifest abuse exceeding the bounds of reason."  (*Doe* v. *United States Swimming, Inc.* (2011) 200 Cal.App.4th 1424, 1435.) The sanctions appellants requested were sweeping evidentiary conclusions that were the heart of appellants' theory of HP's liability-namely that the TDK and Ambit inverters were substantially certain to fail and HP had knowledge of this fact in January 2002.  If the sanctions were ordered, it would provide a windfall to appellants relieving them of their burden of proving their theory of liability.  In denying appellants' request for these sanctions, the trial court properly followed *McGinty*, and its rationale that the purpose of discovery sanctions is not avoidance of a decision on the merits.

35

## DISPOSITION

The summary adjudication of the UCL claims of Degenshein, Giuliano-Ghahramani and the class in the first and second amended complaints in favor of HP is reversed.

The no merits determination as to the CLRA claims of Degenshein and Giuliano-Ghahramani in the first and second amended complaints in favor of HP is reversed.

The summary adjudication of the breach of express warranty claim of Degenshein in favor of HP is affirmed.

The summary adjudication of the breach of express warranty claim of Giuliano-Ghahramani and the class in favor of HP is reversed.

The order denying certification of the CLRA claims is affirmed.

The order denying certification of a nationwide class is reversed.

The order imposing monetary sanctions against appellants is affirmed.

The order denying evidentiary sanctions against HP is affirmed.

Each party shall bear its own costs on appeal.


_____
RUSHING, P.J.


WE CONCUR:

_____
PREMO, J.


_____
ELIA, J.

Trial Court:                                        Santa Clara County Superior Court
                                                    Superior Court No.:  CV817837


Trial Judge:                                        The Honorable James P. Kleinberg


Attorneys for Plaintiffs and                        Green & Noblin
Appellants Ed Rutledge et al.:                      Robert S. Green

                                                    Bramson, Plutzik, Mahler & Birkhaeuser
                                                    Jenelle Welling

                                                    Kershaw, Cutter & Ratinoff
                                                    C. Brooks Cutter


Attorneys for Defendant and                         Drinker Biddle & Reath
Respondent Hewlett-Packard Company:                 Michael J. Stortz
                                                    Beth O'Neal Arnese

                                                    Bergeson
                                                    Daniel J. Bergeson
                                                    John W. Fowler


No appearance for Objector and Respondent


*Rutledge et al. v. Hewlett-Packard Company*
**H036790**